# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7082 | **DATE** | 9/12/2002 |
| **CASE TITLE** | Interlochen Center for the Arts vs. Interlocken International Camp., Inc., d/b/a Interlocken Center for Experiential Learning | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion to transfer venue (Doc. No. 10-1) is granted. This case is transferred to the United States District Court for the District of New Hampshire.

(11) ■ [For further detail see order attached to the original minute order.

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **3** number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 13 2002 date docketed | |
| | Notified counsel by telephone. | | | 43 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 9/12/2002 | |
| | | | date mailed notice | |
| | FTV | courtroom deputy's initials | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |


| | |
|---|---|
| INTERLOCHEN CENTER FOR THE ARTS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 01 C 7082 |
| ) | |
| INTERLOCKEN INTERNATIONAL CAMP, ) | Judge Rebecca R. Pallmeyer |
| INC., d/b/a INTERLOCKEN CENTER FOR ) | |
| EXPERIENTIAL LEARNING, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Interlochen Center for the Arts ("ICA"), a Michigan corporation, filed a five-count complaint against Defendant Interlocken International Camp ("IIC"), a New Hampshire corporation, on September 13, 2001. Plaintiff asserts that Defendant's name "Interlocken" is confusingly similar to Plaintiff's name, and charges Defendant with trademark infringement, unfair competition, trademark dilution, and trademark cybersquatting under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and deceptive trade practices under the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1. Defendant filed a five-count counterclaim against Plaintiff on February 11, 2002, seeking cancellation of Plaintiff's trademark and alleging unfair competition under the Lanham Act; deceptive trade practices under § 358-A:2 of the New Hampshire Revised Statutes; dilution of trademark under New Hampshire common law; and unfair competition under common law. Defendant has moved to transfer venue to the United States District Court for the District of New Hampshire pursuant to 28 U.S.C. §1404(a). Following efforts to settle the case, the parties briefed that motion. For the reasons set forth below, the motion is granted.

## BACKGROUND

Plaintiff ICA, a Michigan corporation with its principal place of business in Interlochen, Michigan, operates schools, camps, and festivals for the performing arts. (Compl. ¶¶ 5, 6.) ICA occupies a 1200-acre campus with 450 buildings, and has 1000 employees during the summer,

43

and 280 employees during the winter season. (Interlochen Center for the Arts Summary ("Interlochen Summary"), Ex. B to IIC's Motion to Transfer Venue ("Def.'s Motion").)[1] During the summer of 2001, ICA enrolled 2,154 students, including at least 351 from Michigan and 232 from Illinois.[2] (Printout of "About Camp" page from ICA's website, available at http://www.interlochen.org/about/faCa.htm (printed 7/26/02 and last visited September 4, 2002), Ex. C to Def.'s Reply Memorandum in support of Motion to Transfer Venue ("Def.'s Reply").) ICA attracts more than 265,200 annual visitors to its campus from all 50 states and has an annual budget of more than $20 million. (Interlochen Summary; Compl. ¶ 15.) ICA has more than 80,000 alumni, including more than 10% of the members of the nation's major symphony orchestras. (Interlochen Summary.)

Interlocken International Camp ("IIC") is a New Hampshire corporation located in Hillsborough, New Hampshire.[3] (Declaration of Richard Herman ("Herman Decl."), Ex. A to Def.'s Motion ¶ 2.) In 1961, Richard Herman founded IIC as the first United Nations-affiliated international summer camp that would bring children together from different cultures and backgrounds in order to "provide students with cross-cultural experiences" and "promote global peace and understanding." (*Id.* ¶¶ 2-3.) In 2000, IIC operated two summer camp sessions for a total of approximately 350 students; travel programs for more than 400 students; and school-year programs for environmental education and leadership training for more than 500 students. (*Id.*

---

[1] Defendant's Exhibit B is a November 26, 2001 printout of a page from Plaintiff's website. As of September 3, 2002, however, the site (http://www.interlochen.org/ica.html) was no longer accessible.

[2] ICA's web page lists Michigan as having a state delegation of 351 students, but also mentions an "all-state" division of 324 Michigan students. The court is uncertain whether some or all of the all-state participants are included within the Michigan state delegation or whether ICA offers two separate programs to a total of 675 Michigan students. Nor is the court certain of how many of Illinois's 232 ICA students reside in this district.

[3] Defendants' submissions spell IIC's locations in several ways. The court follows the spelling used in Mr. Herman's declaration and IIC's web site.

2

¶ 5.) IIC maintains a core year-round staff of approximately ten people who often work seven days a week. (*Id.* ¶ 21.) During the summer months, IIC employs approximately 90 additional people. (*Id.*) IIC has an annual budget of $1.6 million, of which 15% is devoted to providing scholarships to students who require financial assistance. (Id. ¶ 23.) IIC asserts that these scholarship funds are "the only realistic place" from which it can pay the costs of this litigation. (*Id.*)

On May 2, 2000, ICA registered the trademark "INTERLOCHEN" under federal trademark ® 2,346,357 for "Educational services" and a number of related activities.[4] ("Interlochen" Trademark Registration, Ex. 1 to Complaint.) ICA counsel Kegan prepared the trademark applications in Chicago, sent them to Interlochen officials for review, received the signed documents back after the applications were in good order, and caused them to be filed with the United States Patent and Trademark office in Washington, D.C. (Kegan Decl. ¶ 11.) ICA alleges that IIC's Internet and other marketing activities have created confusion over the affiliation between "Interlochen" and "Interlocken" and that there is evidence of overlapping marketing channels and similarities between "Interlochen" and "Interlocken." (Plaintiff's Memorandum of Law in Opposition

---

[4] Specifically, the trademark covers:
Educational services, namely, providing short-term, long-term, workshop, seminar, and distance learning instruction at the primary, secondary, undergraduate, graduate, adult education, senior citizen, and master class levels; instruction in college preparatory academics, arts, music, dance, drama, theater, writing, visual arts, crafts, sports, and athletics; on and off site lectures in the fields of college preparatory academics, arts, music, dance, drama, writing, visual arts, crafts, sports and athletics; arranging and conducting educational, artistic, musical, dance, and drama conferences; development and dissemination of educational materials for others in the fields of arts, music, dance, drama, theater; entertainment, namely live performances and concerts in the nature of arts, music, dance, and drama; entertainment, namely performances of recorded music; summer camp services; providing facilities for recreation activities; festivals featuring a variety of activities, namely arts, music, dance, drama, sports and athletics; rental of musical instruments and accessories; educational services, namely, providing awards and incentives to demonstrate excellence in the fields of arts, music, dance, and drama; audio recording, video recording, and videotape program production; entertainment in the nature of on-going radio and television programs in a wide variety of topics; providing via a computer network information concerning college preparatory academics, arts, music, dance, drama, theater, writing, visual arts, crafts, sports, and athletics . . . .

3

to Defendant's Motion to Transfer Venue (hereinafter "Plaintiff's Opp."), at 2; Declaration of Edward Morgan, ICA Director of Marketing and Publications ("Morgan Decl.") ¶ 4; Declaration of Daniel Kegan, ICA's Counsel ("Kegan Decl."), ¶ 13.) In support of this assertion, ICA has submitted an undated e-mail from IIC's Marketing Director Judi Wisch, expressing concern that ICA was missing "at least 7 inquiries a week" from people mistakenly sending e-mail requests to IIC. (E-mail from Wisch to ICA, Ex. 2 to Complaint.) Wisch said that when she got requests about IIC's "wonderful music and art programs," it was always clear to her that people were looking for ICA. (*Id.*) Her e-mail also mentioned the possibility of the two organizations' putting links to each other's web sites on their home pages. (*Id.*)

ICA asserts that IIC has purposely targeted marketing toward consumers in the Chicago metropolitan area, and as a result, IIC's activities have caused confusion and harm to ICA's reputation in the Northern District of Illinois. (Plaintiff's Opp., at 3; Kegan Decl. ¶ 13; Morgan Decl. ¶ 4.) ICA has submitted two web-page printouts demonstrating that IIC used the Internet to inform prospective students that IIC representatives would be visiting Chicago. The first of these exhibits states that IIC representatives would be visiting Chicago between March 1 and 5 of an unspecified year (9/7/01 Printout of ICA "Come Meet Us" page at http//www.interlocken.org/ meetus.htm (page now changed), Ex. 3 to Complaint). The second page says that the date for the Chicago trip, unlike the scheduled trips to the four other locales listed on the page (all on the East Coast) was "[t]o be announced." (6/4/02 Printout of Interlocken "Come Meet Us!" page (http://www.interlocken.org/meetus.htm) (page now changed), Ex. C to Pl.'s Opp.)[5]

IIC argues that ICA has failed to allege a single episode within this district in which an

---

[5] The court is unsure whether the exhibit cited here as Exhibit 3 to the complaint was actually submitted at the same time as the original complaint. The exhibit lacks the holes that the clerk's staff ordinarily make in docketed documents. In addition, the exhibit is attached to an "Exhibit 4," a document declaring itself to have been printed out on November 28, 2001, more than two months after Plaintiff submitted its complaint on September 13, 2001. Defendant has not objected to the court considering these documents, however, and the court therefore considers it proper to do so.

4

individual confused ICA and IIC. IIC is not registered to do business in Illinois, pays no taxes in the state, and maintains no office, mailing address or employees here.[6] (Herman Decl. ¶ 9.) Virtually all of the IIC's documents and records relating to ICA's infringement claims are in New Hampshire. (Herman Decl. ¶ 8.)

IIC asserts, further, that all of its marketing activities originate from its New Hampshire offices and that only a small portion of its marketing activities is directed toward Illinois. (*Id.* ¶¶ 8, 10-12.) In the past, IIC representatives attended summer program opportunity fairs at the University of Chicago Laboratory School in Hyde Park, but stopped doing so at least ten years ago because they had little success recruiting campers or program participants for IIC. ((Supplemental Declaration of Richard Herman ("Herman Supp. Decl."), Ex. B to Def.'s Reply ¶ 3.) IIC has a program of traveling to hotels or prospective applicants' homes in large eastern cities such as New York, Boston, Washington D.C., and Philadelphia, but has not held a hotel meeting or visited a prospective applicant at home in the Chicago area during the past eight or nine years. (Herman Decl. ¶ 11.) Richard Herman attended camp fairs at the Anshe Emet Synagogue in Chicago in 1998, 1999, and 2000 but his visits did not result in a single camper's being recruited for IIC. (Herman Supp. Decl. ¶ 2.) IIC advertises primarily by mailing catalogues and newsletters to alumni, 75% of whom are concentrated on the east coast and few of whom are located in the Chicago area. (*Id.* ¶ 10.)

In fact, IIC's efforts have generated little response from Illinois residents. During the summer of 2002, only 9 of the 704 participants in IIC and programs affiliated with IIC came from Illinois.[7] (Herman Supp. Decl. ¶ 4.) Over the last several years, the Chicago metropolitan area has accounted for less than 1% of IIC's enrollment; the New York and Boston metropolitan areas, in

---

[6] IIC concedes, as it must in moving for a transfer under 1404(a), that this court has personal jurisdiction over it.

[7] Defendant's Declaration does not indicate how many of the 9 Illinois program participants live in the Chicago metropolitan area.

5

contrast, have respectively accounted for approximately 30% and 16% of IIC's enrollment. (*Id.* ¶ 12.) Approximately 80% of IIC's program participants come from the region extending from New England to the Washington, D.C. metropolitan area. (Herman Supp. Decl. ¶ 4.)

In its counterclaim, IIC alleges that ICA did not use the "Interlochen" name before 1961 except in "sporadic instances," and that ICA obtained its trademark registration fraudulently, in part by failing to disclose the material fact that others were using the word "Interlochen" or similar sounding words to identify their services. (Def.'s Counterclaim ¶ 30.) IIC alleges further that ICA "bulldoze[d] smaller summer camps" to get their acquiescence to ICA's demands and that ICA wrongfully communicated with IIC's insurers in an effort to persuade them to deny coverage for IIC's claims.[8] (Def.'s Counterclaim ¶¶ 19, 20, 30; IIC's Preliminary Statement.)

Both parties have submitted declarations and provided lists of potential witnesses. Defendant identified 26 non-party witnesses and 6 party witnesses (all IIC employees) who would testify at trial, most of whom reside in New Hampshire or within 100 miles of the District of New Hampshire courthouse. (Herman Decl. ¶¶ 14-17; Supplemental Declaration of Richard Herman ("Herman Supp. Decl."), Ex. B to Def.'s Reply ¶ 6.) IIC does not know whether its third-party witnesses would be willing or able to incur the expenses associated with missing work and traveling to Illinois from New Hampshire, Boston, and elsewhere on the eastern seaboard to testify on Interlocken's behalf. (*Id.*) IIC itself can not afford to pay the expenses for third-party witnesses to testify in Illinois. (*Id.*)

Plaintiff has identified approximately 20 non-party witnesses, many of whom reside in the Chicago metropolitan area. (Declaration of Jeannie M. King, Paralegal for ICA's Counsel ("King

---

[8] IIC's insurers, the Insurance Company of Evanston and Markel Insurance Company, have sued IIC in the Circuit Court of Cook County seeking a declaratory judgment they have no obligation to defend or indemnify IIC in this controversy. (Ex. D to Pl.'s Opp.) Defendant says that it has filed a parallel action in the federal district court of New Hampshire, seeking a declaration that its insurers are responsible to defend IIC. (Def.'s Reply, at 9 n.10.) Defendant states further that "after removing the Cook County action to this court, [it] will . . . seek dismissal of the action for lack of personal jurisdiction." (*Id.*)

Decl.") ¶ 3; Kegan Decl. ¶ 18; Morgan Decl. ¶ 3; Declaration of Stephanie W. Tipton, Associate Attorney for ICA's Counsel ("Tipton Decl.") ¶ 2; Declaration of Alan I. Becker, Partner for ICA's Counsel ("Becker Decl.") Decl. ¶ 2.) Plaintiff also identified two party witnesses, both of whom reside in Michigan and are expected to testify at trial. Of the non-party witnesses, many will testify relating to ICA's use of the "Interlochen" name before 1961, the likelihood of confusion between ICA and IIC, IIC's allegations of fraudulent trademark application, and IIC's marketing practices. (Morgan Decl. ¶ 3-4; Kegan ¶ 18.) The others will address issues such as the authenticity of archive documents produced by the Chicago Symphony Orchestra; the history of ICA and IIC's accreditations with the American Camping Association; the communications that ICA had with IIC's insurer; and the effect that the existence of a Camp Interlaken in Wisconsin has on ICA's trademark rights. (King Decl. ¶ 3; Morgan Decl. ¶ 3; Kegan Decl. ¶ 18.)

## DISCUSSION

"A district court may transfer a civil action for the convenience of the parties and witnesses [and] in the interests of justice . . . to any other district or division where it may have been brought." 28 U.S.C. § 1404(a). The court has discretion to transfer the case pursuant to § 1404(a) if: (1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interests of justice. *Pasulka v. Sykes*, 131 F. Supp. 2d 988, 994 (N.D. Ill. 2001) (citation omitted). The moving party bears the burden of demonstrating that the transferee forum is "clearly more convenient." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-220 (7th Cir. 1986). It is not sufficient f the transfer will merely shift the burden from one party to the other. *Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*, 776 F. Supp. 1271, 1276 (N.D. Ill. 1991) (citations omitted). The weighing of factors in motions for transfer of venue is within the sound discretion of the trial judge. *Coffey*, 796 F.2d at 219. In ruling upon such a motion, the court may consider facts presented by way of affidavit, deposition, stipulation or other relevant documents." *Allstate Ins. Co. v. Mathison*, No. 02 C 418, 2002 WL 1396951, at *5

(N.D. Ill. June 26, 2002), *quoting Midwest Precision Servs., Inc. v. PTM Indus. Corp.*, 574 F. Supp. 657, 659 (N. D. Ill. 1983).

In deciding a motion to transfer, the court must weigh the public interest and the private interests of the parties to the litigation. *Recycling Sciences, Int'l., Inc. v. Soil Restoration and Recycling, L.L.C.*, 159 F. Supp. 2d 1095, 1099 (N.D. 2002) (citations omitted). Accordingly, courts addressing motions for transfer under § 1404(a) have recognized and balanced a number of interests. Significant private interests include: (1) plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) convenience of the witnesses; and (5) convenience to the parties. *Law Bulletin Publishing Co. v. LRP Publ'ns, Inc.*, 992 F. Supp. 1014, 1017 (N.D. Ill. 1998). Significant public interest factors hinge on whether a change in venue will promote the interests of justice and include: (1) the court's familiarity with applicable law; (2) congestion of the respective dockets and the prospects for earlier trial; and (3) the relation of the community to the issues in the litigation and the desirability of resolving controversies in their locale. *Berol Corp. v. BIC Corp.*, No. 02 C 559, 2002 WL 1466829, at *5 (N.D. Ill. July 8, 2002). These private and public interest factors are discussed individually below.

1. **Private Interest Factors: Convenience of Parties and Witnesses**

    a. **Plaintiff's Choice of Forum**

    The first factor does not weigh heavily in the court's analysis. As noted above, ICA is a Michigan corporation with its principal place of business in Interlochen, Michigan. Generally speaking, a plaintiff's choice of forum is entitled to some degree of deference, but the plaintiff's choice is accorded less deference when the plaintiff does not reside in the forum selected. *See Nasser v. Soo Line R.R. Co.*, No. 96 C 8636, 1997 WL 223063, at *1 (N.D. Ill. Apr. 25, 1997) (citations omitted); *Russellville Steel Co., Inc. v. Sears, Roebuck & Co.*, No. 99 C 485, 2000 WL 91680, at *3 (N.D. Ill. Jan. 19, 2000).

8

### b. Situs of Material Events

The second factor weighs in favor of transfer. Lanham Act cases generally focus on the "activities of the alleged infringer, its employees, and its documents; therefore, the location of the infringer's place of business is often the critical and controlling consideration." *Confederation Des Brasseries De Belgique v. Coors Brewing Co.*, No. 99 C 7526, 2000 WL 88847, at *3 (N.D. Ill. Jan. 20, 2000), quoting *H.B. Sherman Mfg. Co. v. Rain Bird Nat'l Sales Corp.*, 979 F. Supp. 627, 630, (N.D. Ill. 1997). As IIC argues, New Hampshire was the location of all decisions concerning the use of the Interlocken name, the development of IIC's marketing materials, the creation of its web site, and the registration of its domain name.

In determining the site of material events, IIC's location is not the court's only concern. *Confederation des Brasseries*, 2000 WL 88847, at *3. Rather, a "substantial part of the events may occur both in the district where the infringer is located and the district where confusion is likely to occur." *Id.* In the case before this court, however, relatively little of IIC's conventional advertising activity occurs in or is directed toward Chicago. ICA has not rebutted IIC's statements that IIC does not do any direct mail advertising in Illinois, that only 1% of IIC's campers come from the Chicago area, and that 75% of new enrollment for IIC is generated by alumni families (75% of whom are concentrated on the East Coast). In addition, ICA has presented no evidence permitting an inference that ICA's interpersonal or mail-based marketing has resulted in confusion in this district.

ICA calls particular attention to IIC's Internet marketing, however. Because IIC's Internet advertising specifically mentions Chicago, and because Chicago is ICA's second largest market, ICA argues that it suffers particular harms in this district from IIC's Internet advertising. Citing *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. P'ship*, 34 F.3d 410 (7th Cir. 1994), ICA argues that the focus of the likelihood of confusion should be in the district where harm to the plaintiff would be felt. The *Indianapolis Colts* decision offers little guidance here, however.

9

The opinion includes only two sentences addressing the issue of venue, and it is far from clear that the analysis set forth there would dictate that this case be heard in Illinois. *Indianapolis Colts* was an appeal from entry of preliminary injunction barring a Canadian Football League franchise from calling itself the Baltimore CFL Colts. This moniker had the potential to confuse fans of the National Football League's Indianapolis Colts, a franchise that had originated as the Baltimore Colts. In affirming the injunction, the court noted that "[t]he Indianapolis Colts use the trademarks they seek to defend in this case mainly in Indiana," where "the largest concentration of consumers is likely to be confused," so that "the injury will be felt mainly in Indiana." *Id.* at 411, 412. These facts clearly depart from the instant case, in which Plaintiff makes primary use of its trademark in Michigan and draws the largest concentration of its students from Michigan. *Indianapolis Colts* might support an argument that Michigan courts have jurisdiction over IIC, but it does not suggest that the majority of material events occurred in this Illinois forum.

Finally, Plaintiff asserts that the events allegedly giving rise to IIC's counterclaim occurred in this district. IIC does not dispute that Plaintiff's counsel prepared the trademark applications here. Without addressing the merits of the case, however, the court believes that for the purposes of IIC's fraud claims, a substantial proportion of the relevant events would have occurred in Michigan, not Illinois. It is ICA, and not its counsel, that IIC has accused of fraudulent conduct. In sum, IIC's unquestionably significant activities in New Hampshire outweigh both its controverted marketing activities and ICA's counsel's activities in this district.[9]

### c. Relative Ease of Access to Sources of Proof

The court concludes that this factor weighs very slightly in favor of transfer of venue. As noted, all of IIC's documents are in New Hampshire, while some but presumably not all of ICA's

---

[9] In its counterclaim, IIC also charges that ICA wrongfully pressured other camps with names sounding like "Interlochen" and "Interlocken" and wrongfully attempted to persuade IIC's insurance carrier to decline coverage of IIC. Because neither party has addressed where the material events giving rise to these allegations occurred, the court will not consider the issue.

documents are in its counsel's office in this district. Plaintiff will need to transport some documents from Michigan regardless of how the court rules on this motion, while Defendant will only need to transport documents if the motion is denied. In general, however, "[d]ocuments and records are usually not a very persuasive reason to transfer a case." *Photogen, Inc. v. Wolf*, No. 00 C 5841, 2001 WL 477226, at *5 (N.D. Ill. May 7, 2001) (citation omitted). As other courts have pointed out, regardless of where the trial in this matter may be held, "all relevant documents will have to be collected, copied, inspected and sent to the offices of trial counsel [in both venues.]" *School Stuff, Inc. v. School Stuff, Inc.*, No. 00 C 5593, 2001 WL 558050, at *5 (N.D. Ill. May 21, 2001). In light of technological advances and the wide availability of computers, modems, facsimile machines, etc., moving documents from one location to another need not be burdensome. *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215 (D. Del. 1993).

### d. Convenience of the Witnesses

The convenience of the witnesses is often the controlling factor for § 1404(a) purposes. *Brandon Apparel Group, Inc. v. Quitman Mfg. Co.*, 42 F. Supp. 2d 821, 834 (N.D. Ill. 1999); *Law Bulletin*, 992 F. Supp. at 1018; *Riviera Fin. v. Trucking Servs., Inc.*, 904 F. Supp. 837, 839 (N.D. Ill. 1995). For purposes of this analysis, the court considers the number of witnesses in each forum; the nature, quality, and importance of their testimony; the expense of transportation and the length of time the witnesses will be absent from their jobs; and whether the witnesses can be compelled to testify. *Brandon Apparel*, 42 F. Supp. 2d at 834; *Medi USA, L.P. v. Jobst Inst.*, 791 F. Supp. 208, 211 (N.D. Ill. 1992). The court will focus particularly on the convenience of potential *non-party* witnesses on the assumption that witnesses within the control of the party calling them (i.e., employees) will appear voluntarily. *College Craft Cos., Ltd. v. Perry*, 889 F. Supp. 1052, 1055 (N.D. Ill. 1995).

ICA has named 22 potential witnesses. Of these, six are either current or former officers of ICA, whose convenience the court gives little weight, particularly because all of them must travel

11

from their home districts at least as far as Chicago to testify.[10] Similarly, the convenience of Plaintiff's lead counsel Daniel Kegan, another prospective witness, weighs only very slightly against transfer. *Spherion Corp. v. Cincinnati Fin. Corp.*, 183 F. Supp. 2d 1052, 1058 (N.D. Ill. 2002). In addition, Melissa Herman and Michael Herron, the daughter and son-in-law respectively of IIC's director, have informed Defendant that they would fly to New Hampshire at their own expense if this case were transferred there. (Supp. Herman Decl. ¶ 5; Declaration of Howard L. Kastel, Defendant's counsel, Ex. A to Def.'s Reply ¶ 5.) Three of Plaintiff's other prospective witnesses—Sue Macoy of K& K Insurance in Fort Wayne, Indiana, an unnamed designee of the Luce Press clipping service in Kansas, and an unnamed designee of the American Camping Association—reside outside this court's subpoena power, and the court has reason to believe that the American Camping Association's designee actually resides within 100 miles of the district of New Hampshire.[11]

As Defendant's counsel has noted, it appears that the testimony of several of Plaintiff's remaining 10 witnesses would be tangential. For example, the parties will likely be able to stipulate to the authenticity of any documents produced by the Chicago Symphony Orchestra, the sole issue for which Plaintiff named the orchestra's archivist as a potential witness. Defendant asserts, further, that two of the prospective witnesses named by Plaintiff have stated that they can not or

---

[10] The witnesses in question are Edward Downing, ICA's current president and a Michigan resident; Geraldine Greenspan, ICA's former corporate secretary and assistant to the president and a Michigan resident; Dean Boal, ICA's former president and a Colorado resident; Robert Jacobi, also a former president of ICA and a resident of Florida and Michigan; William Morgan, ICA's director of marketing and publications and a Michigan resident; and David Stave, ICA's vice president of finance and a Michigan resident.

[11] As reflected on mapquest.com on September 3, 2002, Fort Wayne, Indiana and Martinsville, Indiana lie outside the scope of this court's subpoena power. (Fort Wayne approximately 160 miles from downtown Chicago; Martinsville approximately 208 miles from downtown Chicago). Defendant has produced evidence that the American Camping Association's designee for this matter is Bette Bussel, a resident of Wayland, Massachusetts, which is approximately 75 miles from the federal courthouse in Concord, New Hampshire. (Declaration of Bette Bussel, Executive Director of the American Camping Association–New England Section, Ex. E to Def.'s Reply ¶¶ 2, 3.)

will not provide the testimony that Plaintiff proposed they would give.[12] Plaintiff has neither refuted nor responded to these statements. Accordingly, the court can grant little weight to the convenience of these parties.

Plaintiff is left with a total of seven witnesses in or near this district. Of these witnesses, four are former ICA campers or employees who are expected to testify to a single point: that at various times between the 1930's and 1956, ICA and its programs were referred to popularly as "Interlochen," and not by the more generic title "National Music Camp."[13] As one might infer, these witnesses are senior citizens who may be more amenable to testifying in this district than elsewhere. Plaintiff's description of these witnesses leads the court to conclude that some of their

---

[12] Plaintiff stated that David Callahan, a partner at the Chicago law firm of Kirkland & Ellis, represented Lands' End in its effort to apply for a federal trademark of "Interlochen" for shirts. In Plaintiff's words "Lands' End initially questioned ICA's rights but then was presented with extensive evidence of ICA's fame and priority, and . . . Lands' End now recognizes ICA's trademark rights. Mr. Callahan also is expected to testify that he conducted or supervised research to challenge ICA's trademark rights but found no evidence of fraud in ICA's federal trademark application." (Kegan Decl. ¶ 18.) In response to inquiries from Defendant's counsel, however, Mr. Callahan stated that he would and could only testify to the fact that the Lands' End matter was litigated and resolved, and that he was unable to say whether the resolution favored ICA or Lands' End. Mr. Callahan also informed Defendant's counsel that Plaintiff's summary of his prospective testimony substantially overstated the nature and results of the research that was done at Mr. Callahan's request. (Kastel Decl. ¶ 2.) In addition, it is not clear to this court how Mr. Callahan's testimony would usefully supplement the testimony that ICA's counsel in the Land's End matter and this case could provide.

Plaintiff also stated in its submissions that Rich Samuels, a correspondent for Chicago television station WTTW, would "testify to the national publicity devoted to the dispute [between ICA's founder and James Petrillo, the head of the Chicago Federation of Musicians and the American Federation of Musicians] and that Interlochen was often mentioned in the popular press as early as the 1940s." (Kegan Decl. ¶ 18.) In response to inquiries from Defendant's counsel, Mr. Samuels said that he had no personal knowledge of the dispute referred to in Plaintiff's submissions. Mr. Samuels has produced a documentary on James Petrillo, but the documentary did not mention ICA or its alternate name, the "National Music Camp." (Kastel Decl. ¶ 3.) Mr. Samuels does not remember whether the materials he read in preparing the documentary referred to either ICA or the National Music Camp. (*Id.*)

[13] The witnesses in question are Lilias Circle, Joseph Slowik, Nancy Hanson, and Philip S. Harper. (Tipton Decl. ¶ 2; Becker Decl. ¶ 2.)

testimony may well be either duplicative or susceptible to submission by affidavit, however.[14] Plaintiff's three other witnesses are an unnamed designee of an Evanston insurance company, expected to address Defendant's allegations that ICA interfered with IIC's insurance coverage; an unnamed representative of a Jewish community center in Milwaukee, expected to address the issue of when the community center's "Interlaken" camp came into existence and how the camp has been treated by ICA; and a music instructor and former Chicago Lyric Orchestra player who is expected to testify concerning the marketing channels through which children interested in music and the arts learn about ICA.

IIC names 32 prospective witnesses, of whom approximately 15 are current or former employees or consultants.[15] Six other prospective witnesses on IIC's list reside outside of the district of New Hampshire and the 100 miles that its subpoena power extends.[16] IIC's remaining

---

[14] Defendant also suggests that the testimony of at least one of these four witnesses will be equivocal. During a July 17, 2002 interview with a paralegal working for Defendant, prospective witness Joseph Slowik recalled that ICA's gift shop sold (a) a bumper sticker with "National Music Camp" in bold letters and "Interlochen, Michigan" in smaller letters below it; (b) a small button with "NMC" on it; and (c) another button with "Interlochen" printed over a treble clef. (Declaration of Gwen A. Sandstrom, paralegal to IIC's counsel, Ex. D to Def.'s Reply ¶ 3.) Mr. Slowik also stated that he had found the identification badge he wore when he worked at ICA in the 1940's and 1950's. (Id. ¶¶ 3, 4.) "National Music Camp" was written around the top half of the badge, and "Interlochen, Michigan" was written around the lower half. (Id.)

[15] Defendant claims to have submitted two witness lists for a total of 33 prospective witnesses, (Def.'s Reply, at 7), but the court notes that one witness, Richard Chamberlain, is named on both lists. Of these 11 of the prospective witnesses are current or former employees, two are members of IIC's advisory board, one is an employee of a separate but affiliated organization, and one is a former consultant. Although some of these prospective witnesses have never been or are not currently paid by IIC, the court is convinced that these individuals (several of whom appear to be related to IIC's director) are under the control or influence of IIC.

[16] The witnesses in question are Margaret Moorman, a resident of New York; Mark Zidzik, a resident of New Jersey; Marge Ross, a resident of New York; Leon Botstein, a resident of New York and Great Barrington, Massachusetts (135 miles from the federal courthouse in New Hampshire); Deborah Sherr, a resident of Northampton, Massachusetts (112 miles from the New Hampshire courthouse); and Gayle Rediker, a resident of Hamoden, Massachusetts (135 miles from the New Hampshire courthouse). The court has derived its approximate mileage estimates by using the Mapquest.com web site to measure the distance from Concord, New Hampshire to prospective witnesses' towns of residence.

11 witnesses can be divided into two groups. The first consists of approximately 5 people with experiential or familial connections to ICA and IIC, and a willingness to testify that the two entities are not easily confused.[17] It appears likely that there will be some substantive overlap in the testimony given by these witnesses. Included among these five witnesses is Howard Gardner, a Harvard professor of cognitive psychology, to testify about the differences between the two camps, the fact that they are not competitors, and his belief that there is no confusion between them.

The second group consists of long-time participants in the camping and educational industries. ICA expects that Bette Bussel, a representative of the American Camping Association ("the ACA"), will testify to the fact that ICA advertised under the name "National Music Camp" from 1951 to 1990, to the functional differences between ICA and ICC, and to the fact that 10% of the ACA's member camps share the same or similar names.[18] IIC will call Stanford B. Vincent, the editor of a popular guide to summer camps who has visited both camps between 1962 and the 1990s. Vincent is expected to testify to the differences between the camps as well as the history of their advertisements in his guide. John Yonce, the general manager of the publisher of another guide to summer camps and summer schools, is expected to testify to the history of the camps' advertising in his guide, as well as other camps with names sounding like Interlochen and Interlocken that have advertised in his guide. Theodore Levin is an associate professor of music at Dartmouth College, attended IIC as a camper, has arranged scholarships for an international student at ICA, and has advised students to apply to both ICA and IIC. Finally, IIC asserts that Richard Chamberlain, a camping consultant and former president of the ACA, will testify to the

---

[17] The witnesses in this group are Howard Gardner, Harvard professor and parent of an IIC participant; Susan Harari, sister of an ICA participant and parent of an IIC participant; Dane Harwood, long-time Michigan resident and parent of an IIC participant; Karen Wood, violinist and parent of an IIC participant; and Ruth Benedict, sibling of an ICA participant and a past IIC participant herself.

[18] Because it appears that both parties wish to call Ms. Bussel as a witness, the court infers that her testimony is both particularly complex and important to the trial.

differences between IIC and ICA, and Beverly Shiffman, a camp consultant with 33 years' experience referring children to camps, will describe distinctions between ICA and IIC, including ICA's audition requirement for campers. (Supp. Herman Decl. ¶ 6.) In the court's view, the bulk of the testimony expected from this second group of witnesses is crucial to Defendant's case. In addition, with the exception of some potential overlap or redundancy between the testimony of Ms. Bussel and Mr. Chamberlain, both of whom work or have worked for the ACA, this testimony appears to be largely non-duplicative. Moreover, much of the anticipated testimony appears to be complex enough that it could not simply be submitted by affidavit or joint stipulation.

After comparing the witness lists, the court concludes that the convenience of the non-party witnesses weighs in favor of transfer of this case. Plaintiff's seven most prominent non-party witnesses in Chicago include four witnesses whose proposed testimony appears to consist largely of anecdotal recollections of ICA. One of Plaintiff's other three non-party witnesses is an unnamed designee of an insurer who is licensed to sell insurance in New Hampshire and who has filed an action against IIC. The court believes there is reason to expect that this party will either willingly testify against IIC in any forum or provide testimony in the other action against IIC that could be admitted in this federal action. In contrast, Defendant's 11 primary non-party witnesses include some potentially duplicative and anecdotal accounts, but also testimony from numerous professionals in the camping industry. On the submissions before the court, Defendant's relevant non-party witnesses are on balance more numerous, more specialized in their experiences and prospective testimony, and more difficult to replace than Plaintiff's relevant non-party witnesses.

### e. Convenience of the Parties

This factor clearly favors transfer. In general, "the court should consider the parties' respective residences and their ability to bear the costs of litigating in a particular forum." *Allied Van Lines, Inc. v. Aaron Transfer and Storage, Inc.*, 200 F. Supp. 2d 941, 947 (N.D. Ill. 2002). A court should not, however, transfer a case if that ruling "merely transforms an inconvenience for

16

one party into an inconvenience for the other party." *Chemical Waste Mgmt., Inc. v. Sims*, 870 F. Supp. 870, 876 (N.D. Ill. 1994) (citations omitted). In this case, significantly, Plaintiff's chosen forum is not its home forum. Thus, this is not the typical transfer case in which antagonists seek to avoid being the one to travel from point A to point B. Here, transferring the case to New Hampshire arguably reduces the total inconvenience to both parties because it would enable one party to litigate in its own home.

Plaintiff contends that it is more convenient for the parties to litigate in Chicago because Chicago is a major transportation hub. *See Excellcare, Inc. v. Five Star Retirement Servs., Inc.*, No. 00 C 4466, 2000 WL 1808554, at *3 (N.D. Ill. Dec. 7, 2000). Defendant asserts and Mapquest.com confirms, that it is less than a 70-mile drive from Boston's Logan airport to the district courthouse in New Hampshire. (Def.'s Reply, at 6 n.7.) With a Chicago driver's poignant sensitivity to local traffic "flow," this court cannot conclude that this district's downtown courthouse is substantially easier to reach than the Concord courthouse.

Finally, the court notes that ICA may be better positioned than IIC to bear the expenses of litigating in a foreign forum. *See Clearclad Coating, Inc. v. Xontal, Ltd.*, No. 98 C 7199, 1999 WL 652030, at *11 (N.D. Ill. 1999); *Brandon Apparel*, 42 F. Supp. 2d at 834. ICA's $20 million budget is more than thirteen times IIC's annual budget of $1.5 million. Unlike IIC, ICA has not asserted that its own generous scholarship program will be compromised by the costs associated with this litigation. Finally, the court recognizes the administrative costs that litigation can impose. In this instance, the court suspects that ICA's 280 full-time employees are better equipped to weather litigation in a foreign forum than are IIC's 10 full-time employees, particularly given that IIC's employees often work seven-day weeks. These economic and administrative disparities confirm the court's conclusion that the convenience of the parties weighs in favor of transfer to New Hampshire.

17

## 2. Public Interest Factors: Interests of Justice

The court must also consider whether transfer is in the interests of justice by considering "traditional notions of judicial economy rather than the private interests of the litigants and their witnesses." *Brandon Apparel*, 42 F. Supp. 2d at 834, quoting *TIG Ins. Co. v. Brightly Galvanized Prods., Inc.*, 911 F. Supp. 344, 346 (N.D. Ill. 1994). As noted above, this analysis includes considerations such as (1) the court's familiarity with applicable law; (2) the speed with which the case will come to trial; and (3) the relation of the community to the issues and the desirability of resolving controversies in their locale.

The parties agree that the first factor is not significant in this case. With regard to the second factor, the two most relevant statistics in determining speed of litigation are (a) the median months from filing to disposition, and (b) the median months from filing to trial. *Brandon Apparel*, 42 F. Supp. at 835. Both measures suggest that cases are resolved more quickly in this district than in the District of New Hampshire.[19] In the court's view, however, the "relation of the community" factor weighs in favor of New Hampshire. Neither party is a resident of this state, and IIC is incorporated and has its principal place of business in New Hampshire. *See Fisher v. Phoenix Container, Inc.*, No. 99 C 4473, 1999 WL 753938, at *5 (N.D. Ill. 1999). Furthermore, as noted above, IIC's director and officers made all decisions regarding IIC's name, marketing, and web site design in New Hampshire. As the site of the majority of events material to this controversy, New Hampshire is a more appropriate setting for this case than this district.

The court concludes that Defendant has met its burden on this motion. Public interest factors do not weigh strongly in either direction, but the private interest factors, taken in aggregate, clearly favor transfer to New Hampshire. The convenience of the witnesses, the location of the

---

[19] U.S. District Court Judicial Caseload Profiles, available at http://www.uscourts.gov/cgi-bin/cmsd2001.pl. Between September 30, 2000 and September 30, 2001, the average civil case took 5.6 months here and 10.6 months in New Hampshire, while the average case took 26.3 months to move from filing to trial here and 34 months in New Hampshire.

18

material events in this controversy, and most powerfully, the convenience of the parties persuade this court that transfer is appropriate.

The court pauses to note its regret that this litigation has already absorbed the presumably scarce resources of two fine institutions. For the sake of the thousands of program participants who might be affected, the court hopes that the parties can find a mutually beneficial way to resolve this matter amicably, efficiently, and inexpensively.

## CONCLUSION

For the reasons given above, Defendant's motion to transfer venue (Doc. No. 10-1) is granted. This case is transferred to the United States District Court for the District of New Hampshire.

ENTER:

Dated: September 12, 2002

REBECCA R. PALLMEYER
United States District Judge